## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

SHERYL BITTINGER, SUSAN RHODES,
TIFFANY JOHNSON and RENEE BURGE,
*individually and on behalf of all others*
*similarly situated,*

      Plaintiffs,

v.

DNF ASSOCIATES LLC,
KLIMA, PETERS & DALY, P.A., and
SECOND ROUND SUB, LLC,

      Defendants.

Civil Action No. TDC-22-2461

## MEMORANDUM OPINION

Plaintiffs Sheryl Bittinger, Susan Rhodes, Tiffany Johnson, and Renee Burge have filed this class action lawsuit against Defendants DNF Associates, LLC, Klima, Peters & Daly, P.A., and Second Round Sub, LLC for allegedly violating federal and state licensing and debt collection laws based on their business activities of purchasing defaulted credit card accounts and seeking to collect the debts from the account holders. Pending before the Court is Defendants' Motion to Dismiss. Upon review of the pleadings and submitted materials, the Court finds that no hearing is necessary. *See* D. Md. Local R. 105.6. For the reasons set forth below, Defendants' Motion to Dismiss will be GRANTED.

## BACKGROUND

Plaintiffs Sheryl Bittinger, Susan Rhodes, Tiffany Johnson, and Renee Burge are residents and citizens of Maryland and, for personal, family, or household purposes, each obtained a credit card from a financial institution allowing for a loan of less than $25,000. When the accounts went

into default, the financial institutions each assigned the account to Defendant DNF Associates, LLC ("DNF") or Second Round Sub, LLC ("Second Round"). In turn, DNF and Second Round retained Defendant Klima, Peters & Daly, P.A. ("KPD"), a law firm, to file civil actions against each Plaintiff in the District Court of Maryland to collect the "assigned consumer debt." Third Am. Compl. ("TAC") ¶¶ 52, 54, ECF No. 5.

Specifically, on May 14, 2021, KPD and Second Round filed suit against Rhodes alleging that Second Round acquired her credit card account on November 22, 2019 and that Rhodes still owed it $4,297.19. On June 9, 2021, KPD and DNF filed suit against Johnson alleging that DNF acquired her credit card account on February 25, 2019 and that Johnson still owed DNF $1,126.43. On June 11, 2021, KPD and DNF filed suit against Burge alleging that DNF acquired her credit card account on July 31, 2019 and that Burge still owed DNF $1,223.81. On November 19, 2021, KPD and DNF filed suit against Bittinger alleging that DNF acquired her account on August 7, 2019, that after that date she made payments totaling $1,900, and that she still owed $3,712.67 to DNF as well as interest of 16.24 percent on retail purchases and 26.24 percent on cash advances. Each Plaintiff alleges that she has suffered damages including mental anguish, emotional distress, difficulty sleeping, elevated stress levels, and extreme nervousness.

More broadly, Plaintiffs allege that DNF and Second Round each acquired "hundreds of consumer credit card accounts of Marylanders since 2019, extended credit to those Marylanders, and sought to collect on those consumer credit card accounts." *Id.* ¶ 32. According to Plaintiffs, DNF, Second Round, and similar companies acquire these credit card accounts "for pennies on the dollar." *Id.* ¶ 19, at 6, 10. Since March 2019, DNF and Second Round have "filed more than 500 lawsuits against Maryland residents seeking to collect money[.]" *Id.* ¶¶ 12-13. Plaintiffs further allege that KPD, the law firm retained by DNF and Second Round, has sued numerous Maryland

citizens on behalf of companies like DNF and Second Round, whose primary business purpose is "acquiring and investing in credit card retail account transactions made between other parties, in Maryland and elsewhere." *Id.* ¶ 5. Plaintiffs assert, however, that Defendants' efforts to collect on the debt on these credit card accounts are unlawful because DNF, Second Round, and other similar clients of KPD are not properly licensed under Maryland law, and any money paid in response to these collection activities constitute damages.

Specifically, Plaintiffs assert that DNF, Second Round, and other similar clients of KPD, which they refer to collectively as "Unlicensed Debt Buyer Clients" of KPD, are required to have two different licenses under two different Maryland statutes. First, they alleged that these Unlicensed Debt Buyer Clients must be licensed under the Maryland Consumer Loan Law ("MCLL"), Md. Code Ann., Com. Law §§ 12-302 (West 2013), which requires that companies which are "engaged in the business of making loans" are required to have a license to make such loans and extensions of credit. *Id.* Plaintiffs allege that by "acquiring the loan accounts of Plaintiffs and class members," the Unlicensed Debt Buyer Clients "made loans and extensions of credit to Plaintiffs and each class member" under the MCLL. TAC ¶ 31.

Second, Plaintiffs allege that DNF, Second Round, and other Unlicensed Debt Buyer Clients of KPD were each required to secure a license to operate as a sales finance company under the Maryland Sales Finance Company Licensing Law ("SFCLL"), Md. Code Ann., Fin. Inst. § 11-403(a) (West 2013), which provides that "[e]xcept as otherwise provided in this subtitle, a person may not engage in business as a sales finance company unless the person is licensed by the Commissioner" of Financial Regulation. *Id.* They assert that the Unlicensed Debt Buyer Clients qualify as "sales finance companies" under this provision and thus must obtain a license.

Plaintiffs further assert that DNF, Second Round, and other Unlicensed Debt Buyer Clients did not obtain either of these licenses and that while seeking to collect the credit card debt, they knew or acted with reckless disregard of the fact that they lacked such licenses. Plaintiffs thus claim that Defendants were not authorized to engage in their activities of seeking to collect the credit card debt, including by filing suit, so the judgments they obtained against Plaintiffs and other debtors are unenforceable.

In the Third Amended Complaint, Plaintiffs assert the following cause of actions in the following numbered counts: (1) a claim for a declaratory and injunctive relief pursuant to Md. Code Ann., Cts. & Jud. Proc. § 3-406 (West 2020); (2) a violation of the Maryland Consumer Debt Collection Act ("MCDCA"), Md. Code Ann., Com. Law § 14-202, which provides that "[i]n collecting or attempting to collect an alleged debt a collector may not . . . [c]laim, attempt, or threaten to enforce a right with knowledge that the right does not exist"; (3) a violation of the Maryland Consumer Protection Act ("MCPA"), Md. Code Ann., Com. Law § 13-301(14)(iii), which provides that a violation of the MCDCA also violates the MCPA; (4) a claim of "Money Had and Received"; (5) a claim of unjust enrichment; and (5) a violation of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692e (2018), which provides that a debt collector may not make a "threat to take any action that cannot legally be taken or that is not intended to be taken." *Id.*

Plaintiffs have filed their case as a class action and seek relief on behalf the members of a class which they define as:

> All Maryland residents from whom KPD collected money or against whom KPD filed a lawsuit, on behalf of one of KPD's Unlicensed Debt Buyer Clients, concerning a loan account in the amount of $25,000 or less which was made for personal, family, or household purposes.

4

TAC ¶ 6. Plaintiffs also propose a subclass including all class members "who were sued on behalf of DNF and Second Round." TAC ¶ 7. Broadly, Plaintiffs allege that Defendants' actions have "injured and damaged the Plaintiffs and class members" by assessing or collecting amounts which are not due because "the accounts are unenforceable and uncollectible" and by filing lawsuits against class members demanding amounts that are not due because the accounts are unenforceable, thus causing Plaintiffs and class members to suffer mental anguish and emotional distress. TAC ¶ 49.

## DISCUSSION

In their Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants argue that Plaintiffs' claims must be dismissed because they are based on the erroneous claim that DNF, Second Round, and other Unlicensed Debt Buyer Clients are required to be licensed under the MCLL and the SFCLL. Rather, they argue that the Unlicensed Debt Buyer Clients are not required to hold such licenses because they (1) are not in the business of making loans under the MCLL; and (2) are not sales finance companies as defined under the SFCLL. The parties agree that, where all of Plaintiffs' claims are based on the assertion that the credit card debts are unenforceable because the Unlicensed Debt Buyer Clients lacked licenses under the MCLL and the SFCLL, the viability of all of Plaintiffs' claims turn on the legal question of whether the Unlicensed Debt Buyer Clients are actually required to hold such licenses.

### I.    Legal Standards

#### A.    Motion to Dismiss

To defeat a motion to dismiss under Rule 12(b)(6), the complaint must allege enough facts to state a plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is plausible when the facts pleaded allow "the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Id.* Legal conclusions or conclusory statements do not suffice. *Id.* The Court must examine the complaint as a whole, consider the factual allegations in the complaint as true, and construe the factual allegations in the light most favorable to the plaintiff. *Albright v. Oliver*, 510 U.S. 266, 268 (1994); *Lambeth v. Bd. of Comm'rs of Davidson Cnty.*, 407 F.3d 266, 268 (4th Cir. 2005).

Although on a motion to dismiss the Court may not consider facts outside the pleadings without converting the motion to one for summary judgment, Fed. R. Civ. P. 12(d), the Court may consider the submitted checklists from the Maryland Department of Labor, Office of the Commissioner of Financial Regulation, as legal sources relevant to the agency's interpretation of a statute, not sources of additional facts, and has verified the authenticity of the relevant text by comparison to the checklists appearing on the Commissioner's website.

### B.     Statutory Interpretation

The questions of whether Defendants were required to be licensed under the MCLL and the SFCLL are legal questions requiring interpretation of the relevant state statutes under Maryland's principles of statutory construction. "The primary goal of statutory construction is 'to discern the legislative purpose, the ends to be accomplished, or the evils to be remedied by a particular provision.'" *Koste v. Town of Oxford*, 63 A.3d 582, 589 (Md. 2013) (quoting *Barbre v. Pope*, 935 A.2d 699, 708 (Md. 2007)). To accomplish this goal, courts first look to the "normal, plain meaning of the language of the statute, read as a whole so that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory." *Id.* (quoting *Doe v. Montgomery Cnty. Bd. of Elections*, 962 A.2d 342, 351 (Md. 2008)). "If the language of a statute is clear and unambiguous," a court "need not look beyond the statute's provisions," and the "analysis ends." *Id.* (quoting *Barbre*, 935 A.2d at 709). "Where the language of the statute is

ambiguous and may be subject to more than one interpretation," however, courts must "look to the statute's legislative history, case law, purpose, structure, and overarching statutory scheme in aid of searching for the intention of the Legislature." *Id.* (quoting *Doe*, 962 A.2d at 351). Such consideration is necessary to avoid "a construction that is 'illogical, unreasonable, or inconsistent with common sense.'" *Nagle & Zaller, P.C. v. Delegall*, 280 A.3d 653, 665 (Md. 2022) (quoting *Reier v. State Dep't of Assessments and Taxation*, 915 A.2d 970, 989 (Md. 2007)).

## II.    MCLL

Defendants first argue that DNF, Second Round, and other Unlicensed Debt Buyer Clients are not required to have a license under the MCLL. The MCLL consists of provisions in two separate Articles of the Maryland Code: (1) the Maryland Consumer Loan Law – Credit Provisions, Md. Code Ann., Com. Law §§ 12-301 to 12-317; and (2) the Maryland Consumer Loan Law – Licensing Provisions, Md. Code Ann., Fin. Inst. §§ 11-201 to 11-223. *Nagle*, 280 A.3d at 666. As relevant here, the MCLL provides that "[a] person may not engage in the business of making loans under this subtitle unless the person is licensed under or is exempt from the licensing requirements of Title 11, Subtitle 2 of the Financial Institutions Article, the Maryland Consumer Loan Law—Licensing Provisions." Md. Code Ann., Com. Law § 12-302. In turn, Subtitle 2 of the Financial Institutions Article provides that "[u]nless a person is licensed by the Commissioner, the person may not . . . [m]ake a loan." Md. Code Ann., Fin. Inst. § 11-203.1(a)(1). As to both provisions, the term "loan" is defined as "any loan or advance of money or credit" subject to the Maryland Consumer Loan Law—Credit Provisions, "regardless of whether the loan or advance of money or credit is or purports to be made under" those provisions. Md. Code. Ann., Com. Law § 12-301(e)(1); Md. Code Ann., Fin. Inst. § 11-201(g). As the Court of Appeals of Maryland, now the Maryland Supreme Court, has stated, as to the statutory requirements relating to consumer

lending transactions, the Maryland "General Assembly has established a statutory framework whereby the provisions of Title 12 of the Commercial Law Article and Title 11 of the Financial Institutions Article must be read together." *Nagle*, 280 A.3d at 666.

The MCLL does not define what it means to be "in the business of making loans." Md. Code Ann., Com. Law § 12-302. Nevertheless, the plain language of the term "making loans" appear to refer to originating or issuing loans, which are actions taken by the financial institutions who issued the credit card accounts, not the Unlicensed Debt Buyer Clients. By the very term that Plaintiffs have used to label these entities, they acknowledge that they are in the business of buying or purchasing debt, not making or originating loans. Although Plaintiffs allege in the Third Amended Complaint that such an entity "acquires ownership of Maryland consumer loan accounts" and "extends credit to Marylanders," TAC ¶ 5, when considered in context, the allegation that such an entity extends credit can only be fairly construed as asserting that they may allow the debtors to continue to make payments on their outstanding balances, not that they issue to any of the debtors a new credit card account or line of credit, or that they allow the debtors to make additional purchases on the credit cards. The Court therefore concludes that the statutory language strongly suggests that the Unlicensed Debt Buyer Clients are not "in the business of making loans." Md. Code Ann., Com. Law § 12-302.

At best for Plaintiffs, the term "in the business of making loans" can be construed as sufficiently ambiguous to allow for consideration of sources beyond the statutory language itself, such as legislative history and case law. *See Nagle*, 280 A.3d at 670 (concluding that the language "in the business of making loans" was ambiguous for purposes of considering whether it covers law firms engaged in debt collection activities). Upon such consideration, the Court finds that the

8

Case 8:22-cv-02461-TDC Document 33 Filed 07/31/23 Page 9 of 17

legislative history and case law further establish that the Unlicensed Debt Buyer Clients are not engaged in this activity.

In *Nagle*, the Maryland Court of Appeals, considering the question of whether a law firm had engaged in debt collection activities on behalf of a homeowners association which had issued promissory notes to unit owners who had failed to pay assessments, examined the MCLL and specifically the legislative intent surrounding its passage. *See id.* at 665 ("We also review the legislative history of the statute to confirm conclusions drawn from the text or to resolve ambiguities." (quoting *Nationstar Mortgage LLC, v. Kemp*, 258 A.3d 296, 308 (Md. 2021))). The court found that the legislative history reflected an intent by the legislature to impose requirements on only "traditional consumer lenders who are in the business of making loans." *Id.* at 674. In particular, the court noted that the MCLL's licensing process requires an applicant to show that its "business will promote the convenience and advantage of the community in which the place of business will be located," a criterion which appears to contemplate a traditional bank or other lending institution and would be of little relevance to, and difficult to establish, in the case of entities such as a law firm engaged in debt collection or a homeowners association issuing promissory notes. *Id.* (quoting Md. Code Ann., Fin. Inst. § 11-205(2)). Based on its analysis of the legislative history and purpose, the court rejected the argument that a law firm or other entity's extension of credit or offering of a payment plan for the repayment of debt would qualify the entity as "in the business of making loans," finding that such a result that "is not based upon logic or the current licensing practices" of the Office of the Commissioner of Financial Regulation. *Id.* at 675. Based on this determination, the court held that a law firm engaged in debt collection activities on behalf of a client, as well as a homeowners association issuing promissory notes, are not "in the

business of making loans" and therefore are not subject to the provisions of the MCLL. Md. Code Ann., Com. Law § 12-302.

Although the Unlicensed Debt Buyer Clients occupy a slightly different place from the entities addressed in *Nagle*, the reasoning is equally applicable. They are not the kind of "traditional consumer lenders who are in the business of making loans," for whom consideration of whether their "business will promote the convenience and advantage of the community" would be a relevant consideration in any licensing decision, that the Maryland General Assembly intended to be covered by the MCLL. *Nagle*, 280 A.3d at 674-75. At most, their lending activities consist of extending existing credit, or offering a payment plan for the repayment of debt, which the *Nagle* court rejected as activity that would qualify an entity as being "in the business of making loans" and found were "not synonymous with consumer lending activities that require a license under the MCLL." *Id.* at 675. Thus, based on the plain language of the statute, and the reasoning of *Nagle*, the Court finds that Defendants and other Unlicensed Debt Buyer Clients are not "in the business of making loans" and therefore were not required to be licensed under the MCLL before acquiring Plaintiffs' defaulted credit card accounts and seeking to collect the remaining debt. *See id.*; Md. Code Ann., Com. Law § 12-302.

**III.    SFCLL**

Defendants also argue that DNF, Second Round, and other Unlicensed Debt Buyer Clients are not required to have a license under the Maryland Sales Finance Company Licensing Law ("SFCLL"), which provides that "[e]xcept as otherwise provided in this subtitle, a person may not engage in business as a sales finance company unless the person is licensed by the Commissioner" of Financial Regulation. Md. Code Ann., Fin. Inst. § 11-403(a). A "sales finance company" is defined as:

[A] person who is engaged, whether by purchase, discount, pledge, loan, or otherwise, in the business of acquiring, investing in, or lending money or credit on the security of any interest in:

(1)     An installment sale agreement made between other parties;
(2)     A retail credit account transaction, as defined in § 12-501 of the Commercial Law Article, made between other parties; or
(3)     A transaction that deals with home improvement, as defined in § 8-101 of the Business Regulation Article, made between other parties, if collateral security is required by and given to the contractor as a condition to the transaction.

*Id.* § 11-401(l). Plaintiffs argue that Defendants fall within subsection (2), because they are engaged in the business of acquiring, or investing in, retail credit account transactions made between other parties. For purposes of this provision, a "retail credit account" is defined as "an agreement or transaction for the retail sale of goods or services, which is negotiated or entered into and pursuant to which a time sale price is established" and "includes credit card financing by a financial institution." Md. Code Ann., Com. Law § 12-501(l).

Plaintiffs argue that the plain language of the SFCLL unambiguously covers the Unlicensed Debt Buyer Clients because they are "in the business of acquiring" "retail credit account transactions," which they argue include the credit card accounts they purchase for debt collection purposes. Although the Unlicensed Debt Buyer Clients can be fairly characterized as in the business of acquiring the kind of credit card accounts held by Plaintiffs, it is not unambiguously clear that such accounts in default are covered by the term "retail credit account transaction." Md. Code Ann., Fin. Inst. § 11-401(l)(2). Particularly where a sales finance company most typically would be engaged in the financing of a particular consumer transaction, such as the purchase of a vehicle or other consumer good, the inclusion of the term "transaction" after "retail credit account" suggests that a sales finance company is one that lends money to finance such a transaction, or perhaps a loan servicing company that acquires the right to service that loan and

11

receive the monthly payments on that transaction.  It is not clear that a defaulted credit card account, which generally does not consist of a single credit card transaction, and for which the transactions have already been completed, falls within the term "retail credit account *transaction*." *Id.* (emphasis added); *Koste*, 63 A.3d at 589 (stating that courts must read a statute "as a whole so that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory") (quoting *Doe*, 962 A.2d at 351)).  Thus, the Court finds that the definition of "sales finance company" is ambiguous as applied to the Unlicensed Debt Buyer Clients.

The Court must therefore consider the legislative history, case law, and other sources to determine legislative intent.  *See Nagle*, 280 A.3d at 665 ("Review of the text does not merely entail putting the words under the microscope by themselves with a dictionary at hand, because words that appear clear and unambiguous when viewed in isolation may become ambiguous when read as part of a larger statutory scheme." (quoting *Nationstar Mortgage LLC*, 258 A.3d at 308)). First, the Court considers the fact that Maryland case law has previously described the history and purpose of sales finance companies.  In *Associated Acceptance Corporation v. Bailey*, 174 A.2d 440 (Md. 1961), in discussing the separate Maryland Retail Installment Sales Act, the Maryland Court of Appeals noted that sales finance companies were created to help facilitate transactions between sellers and buyers, particularly where large sums of money were involved, because "the problem of financing would prove insurmountable for many sellers, as well as many buyers." *Id.* at 444.  Specifically, the court stated that:

> The large capital necessary for extensive financing necessitated the selling of the purchaser's debt to someone who could pay the dealer cash and continue unaltered the credit extended to the purchaser.  The need for the continued growth of business was met by the development of the sales finance company.

*Id.* Such companies would thus become parties to "tripartite transactions between buyer, seller and finance company."  *Id.* Notably, the court found that the historical role of the sales finance

company "was undoubtedly in the minds of the legislators when the Retail Instalment Sales Act was passed." *Id.* Likewise, this historical understanding of the sales finance company, as one that steps in to pay the seller up front while providing credit to allow the buyer to make payments over time, must be considered in evaluating the legislative intent in creating the licensing requirements of the SFCLL. The fact that the purpose and role of the Unlicensed Debt Buyer Clients, which are entities that purchase defaulted credit card accounts and seek to collect on the debt, place them well outside this historical understanding of the sales finance company, weighs against the conclusion that such entities were intended to be included among those entities required to be licensed under the SFCLL.

Second, consideration of the broader regulatory and licensing regime relating to the financial services sector further demonstrates that the General Assembly did not intend for the SFCLL licensing requirement to apply to the Unlicensed Debt Buyer Clients. Specifically, the fact that the Maryland Collection Agency Licensing Act ("MCALA"), Md. Code Ann., Bus. Reg. § 7-101 (West 2015), more directly regulates the activities of such entities weighs against the conclusion that they must also be licensed under the SFCLL. Under the MCALA, subject to certain exceptions, "a person must have a license whenever the person does business as a collection agency in the State." *Id.* § 7-301(a). In *LVNV Funding LLC v. Finch*, 207 A.3d 202 (Md. 2019), the Maryland Court of Appeals held that a company operating in the same manner as the Unlicensed Debt Buyer Clients was required to be licensed as a "collection agency" under the MCALA. *Id.* at 213. In so ruling, the court discussed the history of the "debt-buying industry," of which the Unlicensed Debt Buyer Clients are a part, and the 2007 amendment to the MCALA that added such entities to the definition of "collection agency":

[T]he General Assembly, recognized the impact of the new business model of creating companies that, instead of collecting debt for the creditor, usually on a

13

> contingent fee basis, purchased that debt (which, with respect to credit card debt, the creditor otherwise would have to charge off) for their own account and either pursued collection on their own behalf or resold the debt to other debt buyers who pursued collection for their benefit. The impact was that these debt buyers were not required to be licensed and thus were free to engage, at least on a State level, in activities that were largely unregulated and often bordered on fraud.
>
> To deal with that, at the urging of the Commissioner of Financial Regulation, the General Assembly added to the definition of "collection agency" a person "who engages directly or indirectly in the business of . . . collecting a consumer claim the person owns, if the claim was in default when the person acquired it."

*Id.* at 212. The court further stated that the "intent of the [2007] amendment was to 'close a loophole' and require that buyers of consumer debt in default be licensed [under MCALA] before engaging in collection efforts." *Id.*

The fact that the General Assembly enacted specific legislation to impose a licensing requirement through the MCALA on debt buyer companies like the Unlicensed Debt Buyer Clients weighs heavily against an interpretation of the SFCLL as including such companies within its licensing requirement, because the General Assembly clearly intended for the MCALA to provide the licensing requirement for such entities. Indeed, if the legislature believed that such companies were or should be regulated elsewhere, such as through the MCLL or SFCLL, there would have been no need to "close a loophole" by enacting the amendment to the MCALA. *Id.* Significantly, the SFCLL requirement that a person may not engage in business as a sales finance company without a license has been in place since 1980, before the 2007 amendment to the MCALA. *See* Md. Code Ann., Fin. Inst. § 11-403(a); Comm'r Fin. Reg. and State Collection Agency Licensing Bd.—Licensees—Revisions, 2017 Md. Laws Ch. 253 (H.B. 182) (describing amendments to the SFCLL separate from the general licensing requirement). Plaintiffs have provided no compelling explanation for why the General Assembly would have created a duplicative licensing regime for such entities.

Third, in 2017, the General Assembly enacted House Bill 182 which amended provisions of both the MCALA and the SFCLL to require that the licenses required by those statutes be obtained and maintained through the Nationwide Mortgage Licensing System and Registry (NMLS). *See* H.B. 182, 2017 Leg., Reg. Sess. Ch. 253 (Md. 2018). In so doing, the General Assembly specifically separated the license requirements for those which do business as a collection agency from those which do business as a sales finance company. H.B. 182, 2017 Leg., Reg. Sess. Ch. 253 at 5, 27; Md. Code Ann., Bus. Reg. 7-301(c); Md. Code Ann., Fin. Inst. § 11-403(b). By maintaining these separate categories and requiring separate licenses for both, the General Assembly further demonstrated an intent to treat collection agencies, a category which clearly includes the Unlicensed Debt Buyer Clients, as distinct from sales finance companies.

Finally, the Court notes that this dichotomy between the regulation of debt buyers under the MCALA and sales finance companies under the SFCLL is reinforced by guidance documents issued by Maryland Department of Labor, Office of the Commissioner of Financial Regulation, which is has statutory responsibility for providing licenses under both the MCALA and the SFCLL. *See* Md. Code Ann., Bus. Reg. § 7-301; Md. Code Ann., Fin. Inst. § 11-403. Under Maryland law, because "[a]dministrative agencies possess an 'expertise'. . . in the field in which they operate or in connection with the statute that they administer," "the interpretation of a statute by the agency charged with administering the statute is entitled to great weight." *Adventist Health Care Inc. v. Md. Health Care Comm'n*, 896 A.2d 320, 330 (Md. 2006) (quoting *McCullough v. Wittner*, 314 552 A.2d 881, 886 (Md. 1989)). Here, Defendants reference two separate licensing application checklists issued by the Commissioner: (1) the "MD Collection Agency License New Application Checklist," which is to be used for applications for a license under the MCALA, Mot. Dismiss Ex. A, ECF No. 27-1; Md. Dept. of Labor, Collection Agencies – Fin. Reg.,

15

https://www.dllr.state.md.us/finance/industry/collag.shtml, *last visited* July 31, 2023; and (2) the "MD Sales Finance License New Application Checklist," which is to be used for applications for a license under the SFCLL, Mot. Dismiss Ex. B, ECF No. 27-1; Md. Dept. of Labor, Sales Fin. Co. – Fin. Reg., https://www.dllr.state.md.us/finance/industry/salesfin.shtml, *last visited* July 31, 2023.  Notably, the MD Collection Agency License New Application Checklist states that it authorizes activities including "[a]ctive debt buying (undertakes direct collections on accounts)," "[p]assive debt buying," "[f]irst party debt collection," and "[t]hird party debt collection." Collection Agency License Checklist at 1.  The Sales Finance License Checklist does not include such activities and instead states that the license authorizes only "[sa]les finance company activities – general" and "[s]ales finance activities – motor vehicles."  Sales Finance License Checklist at 1.  Because these checklists are not formal agency regulations or policy statements, the Court affords them only limited weight.  Nevertheless, the fact that the Commissioner interprets the MCALA, but not the SFCLL, as covering the debt buying activities of companies such as the Unlicensed Debt Buyer Clients provides additional support for the conclusion that the SFCLL licensing requirement does not apply to Defendants.

Considering the historical understanding of sales finance companies, the General Assembly's separate licensing regime for debt buyers in the MCALA, and the Commissioner's reinforcement of that separate arrangement, the Court concludes that the legislature did not intend for companies such as the Unlicensed Debt Buyer Clients to be subject to the SFCLL's licensing requirement.  Because the Court finds that Defendants were not required to obtain a license under either the MCLL or the SFCLL, Plaintiffs claims cannot succeed.  Accordingly, the Court will grant the Motion to Dismiss.

## CONCLUSION

For the foregoing reasons, Defendants' Motion to Dismiss will be GRANTED.  A separate

Order shall issue.


Date:    July 31, 2023

THEODORE D. CHUANG
United States District Judge